**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Christine M. Arguello**

Civil Action No. 07-cv-02182-CMA

DAWN HART,

     Plaintiff,

v.

MICHAEL J. ASTRUE, Commissioner of Social Security,

     Defendant.

---

## ORDER

---

Pursuant to 42 U.S.C. § 405(g), Plaintiff Dawn Hart appealed from the denial of disability benefits by the Social Security Commissioner ("Commissioner").  After a hearing on Plaintiff's application, the Administrative Law Judge ("ALJ") found that Plaintiff was not "disabled" within the meaning of the Social Security Act ("Act") because Plaintiff could perform gainful work within the regional and national economies despite her injuries.

## BACKGROUND

### I.  MEDICAL HISTORY

Plaintiff alleges that she became disabled as a result of injuries she suffered in a car accident on August 18, 2001.  She claims that her mental and physical symptoms have prevented her from returning to her previous gainful employment as a real estate saleswoman.  (*See, e.g.,* Administrative Record at 76-77 (hereafter "Admin.").)

Plaintiff was born on November 5, 1962, she was 38 years old at the time of her car accident. (*Id.* at 85.) She has a high school equivalency degree (GED) and some college education. (*Id.* at 82.) She previously worked as a model, online car sales associate, and real estate saleswoman, the later of which was her occupation at the time of the accident. (*Id.* at 89.) She has one young child who suffers from Down Syndrome.

A. <u>Alleged Physical Impairment</u>

Plaintiff's primary complaint of physical impairment concerns her back, neck and spine. An MRI of the lumbar spine conducted relatively recently after the car accident on December 11, 2001, reflects multiple issues at the L5-S1 level including "[s]ignificant narrowing," "[b]one marrow edema changes," and "[p]rominent left paracentral disc protrusion." (*Id.* at 177.) The December 11, 2001 MRI also revealed a "[b]road-based 2 mm bulge" at the L4-5 level. (*Id.*) A December 20, 2001 MRI of Plaintiff's cervical spine revealed "[m]inimal left-sided disc osteophyte complex formation at C5-C6 with minimal narrowing left neural foramen." (*Id.* at 175.) Her pain doctor, Dr. Christopher Ceneno, noted a "high correlation" between the MRI findings and Plaintiff's symptoms. (*Id.* at 179.)

Plaintiff complained to her doctors of pain that would radiate out from her back to legs and into her feet. (*See, e.g., id.* at 159-74.) During the months following the accident, she sought multiple forms of treatment including trigger point injections, which brought some relief, Neurontin, which also brought pain relief but caused Plaintiff

problems with her ability to complete more complex mental tasks, and transforaminal injections,[1] which also "helped her pain." (*Id.* at 160.)  However, the transforaminal injections did cause Plaintiff to suffer "systemic steroid effect" on at least one occasion. (*Id.* at 168; *see also id.* at 266 (noting that Plaintiff was "very sensitive to steroids")).) Plaintiff also sought to alleviate her pain using Pilates and an acupuncture-like procedure called Intramuscular Stimulation ("IMS").  The IMS proved helpful at first, especially in decreasing Plaintiff's neck pain (*id.* at 181), although Dr. Ceneno suggested that she discontinue the Pilates because it aggravated Plaintiff's symptoms. (*Id.* at 162.)  Plaintiff also discussed surgical fusion with Dr. Ceneno, but decided against it.  (*Id.*)

Dr. Byron Jones provided a fairly descriptive summary of Plaintiff's accident and medical and mental condition in July 2002.  (*Id.* at 507-15.)  He diagnosed her as having:

> (1)  Post concussion syndrome with residual reports of cognitive dysfunction;
> (2)  Post traumatic anxiety and depression;
> (3)  Post traumatic orofacial pain with possible evidence of true TM joint dysfunction;
> (4)  Cervical sprain/strain injury;
> (5)  C5-6 disc/ostephyte of unclear significance;
> (6)  Myogenic thoracic outlet syndrome;
> (7)  Multifactoral headaches;
> (8)  Thoracic sprain/strain injury;
> (9)  Multifactoral lumbar spine pain with evidence of probable discogenic pain and left L5 radiculopathy;
> (10)  Evidence of sacroiliac dysfunction; and

---

[1]  A transforaminal is an injection of a long acting steroid into the opening at the side of the spine where a nerve root exits.  *See* http://www.spineuniverse.com/displayarticle.php/ epidural-3111.html.

(11)  Functional deficits as a result of the above diagnoses.

(*Id.* at 512-13.)

In November 2002, Plaintiff visited the emergency room with complaints of a severe headache.  (*Id.* at 187.)  Apparently, she had been "dancing all . . . night" the night before she arrived at the hospital.  (*Id.*)  The ER doctor, Peter Blakes, stated that he did not believe there was any "acute headache emergency" and, with the pain completely relieved by Demerol, Plaintiff was safe to discharge.  (*Id.* at 188-89.)  Plaintiff also reported that her dancing episode caused her excruciating pain and numbness in her hands.  (*Id.* at 196.)

Although neither Plaintiff nor the Commissioner really address it in their briefing, Plaintiff also visited a physical therapist ("PT").  (*Id.* at 191-207.)  Her PT records reflect that she often presented with a headache and pain between her shoulder blades that would radiate outwards.  (*Id.*)  The records repeatedly state that she presented with "pins and needles" type feelings in different extremities and suffered spells of dizziness when moving her head.  (*Id.*)  A PT exam in April 2002 found that Plaintiff had normal range of motion in her upper extremities but that she was "quite guarded in movement patterns."  (*Id.* at 208.)

Plaintiff also sought treatment for suspected jaw or TMJ[2] problems with Dr. Stephen Winber, D.D.S.  (*Id.* at 221-33.)  Dr. Winber fit Plaintiff with craniomandibular orthotics intended to "reduc[e her] muscular spasms and neuralgia."  (*Id.* at 227.)

---

[2]  TMJ stands for temporomandibular joint.

4

Her visits to Dr. Winber reflect that she was feeling anywhere from two out of ten to eight out of ten on a scale where one equaled "great" and ten equaled "terrible."  (*Id.* at 221-33.)

On multiple occasions in 2003, Plaintiff visited Dr. Sanjay Jatana, who consulted with Plaintiff on her spinal/neck pain.  (*Id.* at 263-70.)  Dr. Jatana suggested that Plaintiff continue with her injections, subject to the steroid sensitivity and that she continue with her physical therapy.  (*Id.*)  His records also note that Plaintiff's pain was "highly variable" and that an artificial disk may be a treatment option for her low back pain "in a few years."  (*Id.* at 268 & 263.)

Dr. Christopher Ryan appears to have been Plaintiff's primary rehabilitation physician from September 2002 through March 2004.  (*Id.* at 285-334.)  His notes contain repeated references to Plaintiff's pain symptoms, back/spinal impairments and mental/cognitive issues.  (*Id.*)  Plaintiff's pain and physical symptoms clearly predominate Dr. Ryan's concerns.  For example, during Plaintiff's first visit, Dr. Ryan notes that Plaintiff is a "lucid historian" and he "doubt[s] that there is much in the way of cognitive compromise . . . ."  (*Id.* at 332, 333.)  However, Dr. Ryan did refer Plaintiff to multiple specialists for her psychological and mental issues.  (*Id.*)  Dr. Ryan's notes and letters establish that he sought multiple courses of treatment and different medications to alleviate Plaintiff's injuries, but his records indicate little improvement in Plaintiff's physical or mental condition.  (*See id.* at 286 ("[Plaintiff] returned to see me.  She is still having a terrible time.").)  In September 2005, Dr. Ryan completed a "Revised Medical

Assessment of Ability to do Work-Related Activities (Physical)" for Plaintiff. (*Id.* at 404-08.) Notably, he found that Plaintiff could occasionally lift and carry up to ten pounds, but nothing more; she could never be exposed to environmental hazards (*e.g.,* unprotected heights, moving mechanical parts, temperature extremes, etc.); she could not operate foot controls; she should avoid unusual postures (*e.g.,* climbing stairs and scaffolds, balancing, stooping, kneeling, etc.); she could only sit for thirty minutes at a time; stand and walk for fifteen minutes at a time and sit for four hours out of an eight-hour day; stand for one hour out of an eight-hour day; and walk for one hour out of an eight-hour day. (*Id.*) He also precluded her from feeling, pushing or pulling with her hands, but did permit occasional reaching, handling and fingering activities. (*Id.* at 408.)

B.  Alleged Mental Impairment

Plaintiff saw doctors for mental health evaluation and treatment, as well. Dr. Stephen Schmitz, a clinical neuropsychologist, examined Plaintiff on multiple occasions, first in 2002. (*Id.* at 362.) In May 2002, Dr. Schmitz noted that Plaintiff "presented as a fairly articulate individual who did not give evidence of any significant cognitive compromise during her spontaneous conversation. A brief screening examination, however, identified some deficits." (*Id.* at 372.) He then described her test results:

> She had some difficulty learning five words and at 10 minutes only recalled three words. She then self corrected the 4th word but was unable to remember the fifth word. She finally recognized that word from a list of three words. She also performed quite poorly on a complex thinking task.

(*Id.*)  He referred her to psychological counseling and to a neuropsychological

rehabilitation specialist.  (*Id.*)

Dr. Ryan referred Plaintiff to Dr. Marita Keeling for evaluation and psychiatric

treatment in November 2002.  (*Id.* at 353.)  Dr. Keeling summarized her treatment

and opinions in a February 17, 2004 letter to Plaintiff's auto insurer.  (*Id.* at 382-84.)

Dr. Keeling recounted the seven different drugs that Plaintiff was taking at the time,

Neurontin, Adderall XR, Trazodone, Gabatril, Ambien, Vicodin and Risperdal.  (*Id.* at

383.)  Dr. Keeling diagnosed Plaintiff with four separate mental disorders attributable to

the car accident:  (1) major depressive episode; (2) anxiety disorder; (3) dementia due

to head injury; and (4) pain disorder associated with both psychological factors and a

general medical condition.  (*Id.* at 382.)  Dr. Keeling concluded that Plaintiff's dementia

"makes it harder for [Plaintiff] to understand and/or learn what needs to be done and to

carry it out."  (*Id.* at 384.)

Dr. Keeling also summed up her opinions regarding Plaintiff in a June 10, 2004

letter to the Commissioner.  (*Id.* at 353-56.)  Dr. Keeling opined that Plaintiff suffers from

"dementia from the closed head injury," which caused Plaintiff to forget conversations

and appointments.  (*Id.* at 353.)  Dr. Keeling states that Plaintiff's treatment at the time

included a cocktail of five separate pain and anxiety medications, Neurontin, Adderall

XR, Vicodin, Depakote and Risperdal, but even this cocktail was not completely

effective.  (*Id.* at 354.)  Dr. Keeling concludes her letter by stating that Plaintiff's

"dementia is unlikely to improve much further since it is more than two years since her

accident" and Plaintiff is "totally and permanently disabled from engaging in competitive employment." (*Id.* at 355 & 356.)

In September 2005, Dr. Keeling completed a Medical Source Statement that described Plaintiff's ability to do work-related activities. (*Id.* at 386-97.) Dr. Keeling found Plaintiff had "marked" limitations on her daily living activities, ability to maintain social functioning, ability to maintain concentration for extended periods of time, ability to maintain a persistent pace of work, ability to ask simple questions, ability to accept instructions and appropriately respond to criticism from supervisors, and ability to work in coordination with others without being distracted.[3] (*Id.* at 389, 392-93.) Dr. Keeling found that Plaintiff had moderate limitations in other functioning areas, including the ability to carry out detailed instructions, remember locations and work-like procedures and maintain a schedule and regular attendance. (*Id.* at 392-93.)

Dr. Lynn Parry first examined Plaintiff in February 2004. (*Id.* at 272.) Dr. Parry concluded that Plaintiff was a "woman who is clearly distressed. She has difficulty staying on track. She has poor concentration abilities. She can follow commands well and answer questions appropriately but she is mildly agitated and certainly depressed." (*Id.* at 273.) Dr. Parry's testing confirmed "mechanical low back pain" and mild difficulty with walking and movement and Dr. Parry seemingly agrees with Dr. Keeling that Plaintiff should continue to treat with physical therapy. (*Id.* at 274-75.) However,

---

[3]   A "marked" limitation is a "serious limitation." The ability to function "is severely limited but not necessarily precluded. A marked limitation exists when the degree of limitation seriously interferes with the individual's ability to function independently, appropriately, effectively and on a sustained basis." (*Id.* at 386.)

Dr. Parry also identified some issues that "have not been effectively addressed." (*Id.* at 275.) For example, Dr. Parry found that Plaintiff suffered from "Post-traumatic vertigo" and injury-related movement disorders. (*Id.*) Dr. Parry also questioned Plaintiff's then-current drug cocktail and speculated that the Neurontin, although helpful for pain, may have contributed to her cognitive impairments. (*Id.* at 275-76.)

Dr. Brett Valette, a state consultative psychologist, examined Plaintiff in September 2005 and reviewed her medical records. (*Id.* at 409-12.) Dr. Valette found Plaintiff to be cooperative and truthful. (*Id.* at 410.) However, he found significantly less severe symptoms than Dr. Keeling, and questioned Plaintiff's complaints of memory loss.[4] (*Id.* at 412.) Notably, he found her complaints "vague" and opined that she fell within the normal range of test results. (*Id.*) His conclusion was that Plaintiff suffered from Somatization Disorder and that she had no real physiological basis for her mental issues. (*Id.*) He filled out a "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" in which he concluded that Plaintiff had no mental impairments to her ability to do work. (*Id.* at 413-15.)

---

[4]   In February 2005, Dr. Keeling drafted a note that responds to Dr. Brett Valette's diagnosis. (*Id.* at 522-24.) Dr. Keeling opines that Dr. Valette probably would not have made the diagnosis he made had Dr. Valette had access to all of the medical records. (*Id.*) Dr. Keeling notes that the agreement among Drs. Lynn Parry, Ryan and herself contrasts with Dr. Valette's assessment and that Dr. Valette's diagnosis of Somatization Disorder does not meet diagnostic criteria. (*Id.*)

Dr. Parry also issued a riposte to Dr. Valette's analysis in January 2006. Dr. Parry found that Dr. Valette either "did not have access to all of the records or does not fully understand the changes that can occur in patients with head injury and how that affects psychological testing. (*Id.* at 516.)

C.    Plaintiff's Daily Activities

At the time she filed her claim for disability benefits, Plaintiff lived in an condominium with her son.  (*Id.* at 104.)  Before the car accident, Plaintiff claims that she was physically active, worked out daily, played tennis, and socialized with friends. (*Id.*)  Her physical activities have diminished drastically since the accident and now she is limited to household chores like vacuuming, doing the dishes and cleaning the floors. (*Id.* at 104-05.)  However, more physically demanding chores, like cleaning the bath tub and laundry, have lapsed as a result of her symptoms.  (*Id.* at 104)  She still drives and goes for short walks with her son, but these activities leave her fatigued.  (*Id.*)  She also watches TV news, but she rarely reads newspapers or books because she has difficulty focusing on what she has read.  (*Id.*)  She rarely cooks because she does not like having to clean up, but she prepares microwave meals and eats cereal, ice cream and candy.  (*Id.* at 105.)  Plaintiff alleges that her interaction with family and friends has decreased since the accident.  (*Id.* at 105-06.)  She states that they don't call her much and she does not feel like calling them, either.  (*Id.* at 106.)

II.    **PROCEDURAL HISTORY**

Plaintiff filed her application for benefits on April 20, 2004.  (*Id.* at 65.)  Her request was denied and Plaintiff submitted a timely request for a hearing before the ALJ.  (*Id.* at 42.)  The hearing took place on March 15, 2006.  (*Id.* at 555-606.)  In a written decision, the ALJ found that Plaintiff was not disabled because he could perform jobs existing in the national economy.  (*Id.*)  After granting Plaintiff an extension of time

to file her appeal, the Appeals Council denied Plaintiff's request for review.  Thus, the

ALJ's decision became the final agency action and Plaintiff appealed to this Court.  (*Id.*

at 8-10.)

A.      The ALJ Hearing

Plaintiff and two experts testified at the hearing.  The first to testify was

Dr. Robert Pelc, a state medical expert (*id.* at 557-78), followed by Plaintiff (*id.* at

578-92), followed by Pat Pauline, the vocational expert.  (*Id.* at 592-604.)

1.      *Dr. Pelc's Testimony*

Dr. Pelc testified regarding Plaintiff's psychological symptoms and potential

vocational limitations as a result of those psychological symptoms.[5]  He opined that

inconsistencies existed in the record regarding the origin and severity of Plaintiff's

somatoform disorder.  (*Id.* at 560.)  He acknowledged the difference in opinion among

the doctors and professionals in the record (namely, Dr. Valette versus the remaining

doctors), but clearly came down on the side of Dr. Valette, who had concluded that

Plaintiff did not suffer from "major residual cognitive effects" as a result of her auto

accident injuries.  (*Id.*)  Thus, Dr. Pelc's opinion contrasted with Plaintiff's treating

professionals, Drs. Ryan, Parry, and Keeling, who found that Plaintiff's cognitive abilities

---

[5]   The ALJ apparently provided Dr. Pelc with a series of written interrogatories regarding Plaintiff's medical history.  (*Id.* at 504-06.)  Highlights from Dr. Pelc's answers include number seven, wherein Dr. Pelc found a distinction between Dr. Valette's assessment of Plaintiff and Dr. Keeling's assessment.  (*Id.* at 505.)  Dr. Pelc then stated Plaintiff presented significant "emotional factors" and that Dr. Schmitz's objective evaluation lead him to believe that Dr. Keeling's opinions should be given less weight.  (*Id.*)  Also, in response to question number nine, Dr. Pelc found that a diagnosis of dementia was "not supported by objective test data." (*Id.*)

were moderately to markedly compromised.  (*Id.*)  However, Dr. Pelc did acknowledge

that Plaintiff likely had problems with her "processing speed," which, in turn, affected her

ability to process complex tasks.  (*Id.* at 561.)

### 2. *Plaintiff's Testimony*

Plaintiff's testimony briefly covered her employment history.  She stated that she

had previously worked in real estate, but did not discuss her earlier employment as an

online car sales associate or model.  (*Id.* at 578-79.)  The focus of her testimony was on

her daily routine, *e.g.*, her ability to groom herself, care for her young son, cook, clean

and manage personal finances.  (*Id.* at 579-92.)  Plaintiff stated that she suffered from

dizziness, vertigo and nausea, which made showering in the morning and cooking over

a stove difficult.  (*Id.*)  She said that when she became dizzy, should would have to lie

down or "lounge" to regain her composure and that her symptoms frustrated her and

made her anxious around other people.[6]  (*Id.* at 583, 587.)  She testified that her

condominium, where she lived with her son, was always messy because her symptoms

prevented her from giving it the cleaning and attention it needed.  (*Id.* at 582.)

Regarding her son, she estimated that he weighed about 18 pounds and that she

could pick him up and hold him, but stated that handling her son was difficult because of

her symptoms.  (*Id.* at 589.)  She stated that she occasionally worked with him on his

disability, but not as much as she wanted to because of her symptoms.  (*Id. at* 591.)

---

[6]   However, Plaintiff also stated that she was taking Effexor and that the drug helped
with her anxiety and frustration.  (*Id.* at 588.)

3.      *Ms. Pauline's Testimony*

The last person to testify at the hearing was the state vocational expert,

Ms. Pauline.  Ms. Pauline first testified regarding the exertion and skill levels of the jobs

that Plaintiff had previously performed.  (*Id.* 594.)  The ALJ then asked Ms. Pauline if

jobs existed in the regional and national economy for a "younger individual with a GED

and the work history we have discussed."  (*Id.* at 595.)  He asked her to assume the

limitations spelled out in the July 2004 residual functional capacity assessment

completed by the state agency and the revised Medical Source Statement used by

Dr. Pelc.  (*Id.*)  Ms. Pauline identified three jobs that a hypothetical person described by

the ALJ could perform:  (1) light assembly; (2) production assembler; and (3) small

product assembler.  (*Id.*  at 596.)  Ms. Pauline stated that there were 3,275 positions

available in Colorado.  (*Id.*)  On cross examination by Plaintiff's attorney, Ms. Pauline

stated that these jobs would not allow for many unscheduled breaks during the work

day or tolerate more than two absences per month.  (*Id.*)

B.      The ALJ's Written Decision

The ALJ issued a written decision dated May 17, 2006.  (*Id.* at 23.)  The decision

does an admirable job explaining the applicable law, including the five-step disability

evaluation process set out by the regulations and the case law.  (*Id.* at 26-36.)

Regarding the medical evidence in the record, the ALJ found that Plaintiff indeed

suffered from various back and spinal injuries as a result of her auto accident, but found

that her mental and physical abilities were not as limited as Plaintiff alleged them to be.

13

(*Id.*)  The ALJ found that Dr. Pelc had a "thorough amount of understanding of the disability program and the evidentiary requirements and is familiar with the other information in the claimant's case record . . . ."  (*Id.* at 34.)  Thus, he gave Dr. Pelc's opinions substantial weight.  (*Id.*)  In contrast, the ALJ found Dr. Keeling's opinions internally inconsistent and at odds with the remaining evidence in the record; thus, he gave them little weight in his RFC computation.  (*Id.* at 30.)  The ALJ did not discuss Dr. Jones, Dr. Winber's or Dr. Parry's opinions.

The ALJ found that Plaintiff's testimony was not entirely credible because her alleged symptoms did not comport with her daily activities.  Notably, the ALJ found that Plaintiff could perform daily chores, including caring for her son, although the ALJ mistakenly described Plaintiff's son as having autism and not Down Syndrome.  (*Id.* at 33.)  He also found Plaintiff's credibility lacking because her ability to care for her baby, "which can be quite demanding both physically and emotionally," was inconsistent with her testimony that vertigo, dizziness and nausea caused her to walk into walls and walk with a tilt.  (*Id.* at 33.)  The ALJ also questioned whether Plaintiff left her job in real estate as a result of her disability or for other, unknown reasons unrelated to her disability.  (*Id.* at 33.)

On the basis of his determinations regarding the weight to give the various medical opinions and on Plaintiff's credibility, the ALJ deduced the following RFC: Plaintiff could lift and/or carry twenty pounds occasionally and ten pounds frequently; stand, walk and sit (with normal breaks) for six hours out of an eight-hour day; unlimited

14

in push and/or pull activities (including hand or foot controls); occasionally climb ramps

and stairs, but never climb ladders, ropes, scaffolds; occasionally balance, stoop, kneel,

crouch and crawl; limited in reaching in all directions and fingering; no established visual

communicative or environmental limitations except to avoid concentrated exposure to

hazards like machinery, heights, etc.; marked limitations on her ability to make complex

work-related decisions and on interacting appropriately with the public; moderate

limitations on her ability to understand, remember and carry out complex instructions,

interact with co-workers and supervisors and respond to usual work situations and

changes in work routine; and mild limitations on her ability to understand, remember

and carry out simple instructions and make judgments on simple work-related decisions.

(*Id.* at 34.)

With this RFC in mind, the ALJ concluded that Plaintiff could perform a number of

jobs that existed within the national economy.  (*Id.* at 38.)  Thus, he found that she was

not disabled within the meaning of the Act.  (*Id.*)

## STANDARD OF REVIEW

Section 405(g) of the Act establishes the scope of this Court's review of the

Commissioner's denial of disability insurance benefits.  *See* 42 U.S.C. § 1383(c)(3)

(2006) (incorporating review provisions of 42 U.S.C. § 405[g]).  Section 405(g) provides,

in relevant part, that:

> [t]he findings of the Commissioner of Social Security as to any fact,
> if supported by substantial evidence, shall be conclusive, and where a
> claim has been denied by the Commissioner of Social Security or a
> decision is rendered under subsection (b) of this section which is adverse

> to an individual who was a party to the hearing before the Commissioner
> of Social Security, because of failure of the claimant or such individual
> to submit proof in conformity with any regulation prescribed under
> subsection (a) of this section, the court shall review only the question
> of conformity with such regulations and the validity of such regulations.

42 U.S.C. § 405(g).  Thus, this Court's review is limited to determining whether the record as a whole contains substantial evidence supporting the Commissioner's decision.  *See* § 405(g); *Hamilton v. Secretary of Health & Human Servs.*, 961 F.2d 1495, 1497–98 (10th Cir. 1992).  The Court must uphold the Commissioner's decision if it is supported by substantial evidence.  See *Dollar v. Bowen*, 821 F.2d 530, 532 (10th Cir. 1987).  This Court cannot re-weigh the evidence nor substitute its judgment for that of the ALJ.  *Jordan v. Heckler*, 835 F.2d 1314, 1316 (10th Cir. 1987).  That does not mean, however, that review is merely cursory.  To find that the ALJ's decision is supported by substantial evidence, the record must include sufficient relevant evidence that a reasonable person might deem adequate to support the ultimate conclusion.  *Frey v. Bowen*, 816 F.2d 508, 512 (10th Cir. 1987).  A decision is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it.  *Turner v. Heckler*, 754 F.2d 326, 328 (10th Cir. 1985).  The ALJ's decision is also subject to reversal for application of the wrong legal standard.  *Bernal v. Bowen*, 851 F.2d 297, 299 (10th Cir. 1988); *Frey*, 816 F.2d at 512.

<u>**ANALYSIS**</u>

Under the standard of review described above and the applicable law described below, the Court remands this case to the ALJ for additional proceedings consistent with this opinion.

**I.      APPLICABLE LAW – THE FIVE-STEP PROCESS**

A claimant must qualify for disability insurance benefits under the Act.  To do so, the claimant must meet the insured status requirements, be less than sixty-five years of age and under a "disability."  *Flint v. Sullivan*, 951 F.2d 264, 267 (10th Cir. 1991).  The Act defines a disability as an inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A).  In proving disability, a claimant must make a *prima facie* showing that she is unable to return to the prior work she has performed.  *Huston v. Bowen*, 838 F.2d 1125, 1132 (10th Cir. 1988).  Once the claimant meets that burden, the Commissioner must show that the claimant can do other work activities and that the national economy provides a significant number of jobs the claimant could perform.  *Frey*, 816 F.2d at 512.

The Commissioner has established a five-step process to determine whether a claimant qualifies for disability insurance benefits.  *See* 20 C.F.R. § 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987) (describing five-step analysis).  A claimant may be declared disabled or not disabled at any step; and, upon such a determination, the

subsequent steps may be disregarded.  *See* 20 C.F.R. § 404.1520(a); *Williams v. Bowen*, 844 F.2d 748, 750 (10th Cir. 1988).  First, the claimant must demonstrate that she is not currently involved in any substantial gainful activity.  20 C.F.R. § 404.1520(b).  Second, the claimant must show a medically severe impairment (or combination of impairments) which limits his physical or mental ability to do basic work activities. § 404.1520(c).  At the third step, if the impairment matches or is equivalent to established listings, the claimant is judged conclusively disabled.  § 404.1520(d).  If the claimant's impairments are not equivalent to the listings, the analysis proceeds to the fourth step.  At this stage, the claimant must show that the impairment prevents her from performing work she has performed in the past.  *See Williams*, 844 F.2d at 751 (citations omitted).  If the claimant is able to perform his previous work, she is not disabled.  20 C.F.R. § 404.1520(e); *Williams*, 844 F.2d at 751.  The fifth step requires the Commissioner to demonstrate that: (1) the claimant has the RFC to perform other work based on the claimant's age, education, past work experience; and (2) there is availability of that type of work in the national economy.  *See* 20 C.F.R. § 404.1520(f); *Williams*, 844 F.2d at 751.

## II.    THE ALJ'S ASSESSMENT OF PLAINTIFF'S MEDICAL RECORD

In this case, Plaintiff argues that the ALJ erred in failing to give controlling weight to the opinions of three treating doctors:  Dr. Ryan, Dr. Keeling, and Dr. Parry.  (Doc. # 15 at 19.)

### A.    Treating Medical Opinions Are Typically Given Controlling Weight.

A treating physician's opinion regarding "the nature and extent of a claimant's

disability is entitled to 'controlling weight' when it is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and is 'not inconsistent with other substantial evidence in [the claimant's] case record.'" *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (quoting 20 C.F.R. § 416.927(d)(2)) (alterations in original); *see also Castellano v. Secretary of Health & Human Servs.*, 26 F.3d 1027, 1029 (10th Cir. 1994).  If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must "give good reasons" for the weight given to a treating physician's opinion.  20 C.F.R. § 416.927(d)(2); *see also Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001) (requiring ALJ to supply "specific, legitimate reasons" for rejecting opinion of treating physician).

    B.    <u>The ALJ's Decision To Give Reduced Weight To Dr. Ryan's Opinion Is Supported By Substantial Evidence</u>.

There is no question that Dr. Ryan is a treating physician and Plaintiff is correct that the ALJ discounted the opinion of Dr. Ryan.  In fact, the ALJ does not appear to have given controlling weight to any of Dr. Ryan's disability opinions because the ALJ's RFC conflicts with Dr. Ryan's proposed RFC in numerous respects, *e.g.,* Plaintiff's ability to stoop, kneel, climb stairs, operate foot controls, etc.  The ALJ explained that he rejected Dr. Ryan's opinion because Dr. Ryan's opinion on Plaintiff's functional capacity conflicted with her daily activities, specifically the fact that Plaintiff cared for, lifted, and carried her eighteen-pound son. (Admin. at 34.)  Given the ALJ's explanation, the Court concludes that the ALJ clearly articulated his reason for rejecting Dr. Ryan's opinion regarding Plaintiff's functional capacity.  Thus, the question is whether the ALJ's decision finds support in the record.

The Court concludes that it does because substantial evidence in the record to supports the ALJ's decision to accord lesser weight to Dr. Ryan's RFC opinions.  For example, Plaintiff admits that she could drive and perform basic housework and chores like vacuuming and cooking.  (*Id.* at 104.)  Additionally, numerous treating doctors, including Dr. Ryan himself, make note of the fact that Plaintiff's recommended exercise routine involved using a StairMaster and light weights.  (*See, e.g., id.* at 286-87 (treatment note from Dr. Ryan stating that Plaintiff should use a StairMaster for exercise).)  Plaintiff's ability to care for her son, her performance of basic housework and her ability to engage in light exercise conflict with Dr. Ryan's restrictive RFC assessment and provide substantial evidence to support the ALJ's decision to not give Dr. Ryan's opinion controlling weight.

C.    The ALJ's Decision To Give Lesser Weight To Dr Keeling's Opinion Is Supported By Substantial Evidence.

The ALJ also rejected Dr. Keeling's opinion that Plaintiff suffered from "marked" limitations in her ability to complete tasks.  (*Id.* at 35.)  The ALJ found Dr. Keeling's opinions were not entitled to controlling weight for the same reasons that he found Dr. Ryan's opinions problematic, inconsistencies between Plaintiff's daily activities and Dr. Keeling's conclusions.  (*Id.* at 30.)  Especially troubling for the ALJ was the fact that Plaintiff could care for her disabled son, which the ALJ found to be at odds with Dr. Keeling's assessment of Plaintiff's mental abilities.  This explanation is sufficient for purposes of review by this Court.  Thus, the Court now must determine whether substantial evidence supports the ALJ's decision to give "little weight to the opinions of Dr. Keeling."  (*Id.* at 30.)  This question presents a closer call than did the opinions of Dr. Ryan.

However, the Court again finds substantial evidence in the record to support the ALJ's decision.  Dr. Keeling found that Plaintiff had "marked" limitations[7] on her daily living abilities, social functioning abilities and that Plaintiff had problems maintaining concentration and completing complex tasks.  The reason the ALJ rejected these opinions, Plaintiff's ability to care for her infant son, does not necessarily conflict with Dr. Keeling's opinion.  This Court cannot say that changing diapers, bathing, feeding and dressing a child, and taking a child to doctor's appointments necessarily require sustained, high-level concentration.  Plaintiff also stated that caring for her son mentally and physically fatigues her, a fact that is supported in the medical record.  Moreover, the other activities described by Plaintiff, cooking with the microwave, short walks and the occasional date or night dancing, likewise do not directly contradict Dr. Keeling's opinion regarding Plaintiff's mental functioning capacity.  Thus, the Court seriously questions whether the opinions of Dr. Keeling actually do conflict with Plaintiff's daily activities.

These questions notwithstanding, the Commissioner's burden to uphold the ALJ's decision is not an onerous one and merely because the Court questions whether changing a diaper or microwaving a TV-style dinner requires sustained concentration is not enough to overturn the ALJ's determination.  Moreover, as any parent knows, keeping track of a young child is a never-ending task that requires nothing if it does not require persistence.

---

[7]   Again, Dr. Keeling defined "marked" limitations as a limitation that "seriously inter-feres with the individual's ability to function independently, appropriately, effectively and on a sustained basis."  *See supra.*

Moreover, the Court may hesitate regarding the ALJ's decision, but the Court should not re-weigh the evidence.  Additionally, as the Commissioner points out, the ALJ did not completely reject Dr. Keeling's opinions.  In fact, the ALJ agreed with Dr. Keeling that Plaintiff had serious limitations in her ability to make complex work-related decisions and moderate limitations in her ability to "understand, remember and carry out complex instructions, interact appropriately with supervisors and co-workers, and respond appropriately to usual work situations and changes in routine work setting." (*Id.* at 37.) Therefore, reversal or remand on this point is not warranted because on a review of the entire record, the Court cannot say that the ALJ's decision to reject Dr. Keeling's opinion is substantially outweighed by the remaining evidence in the record.  *See Frey*, 816 F.2d at 512.

D.    The ALJ's Failure To Consider Dr. Parry's Opinion Requires Remand.

The ALJ did not directly address any opinion offered by Dr. Parry in his written decision.  Thus, the ALJ did not directly explain the weight, if any, he gave to Dr. Parry's opinions.  Plaintiff argues that this omission is a reversible error because Dr. Parry was a treating physician and the ALJ is required to explain his decision not to give Dr. Parry's opinions controlling weight.

As noted above, Social Security Regulations and Tenth Circuit law require an ALJ who rejects a treating doctor's opinion to explicitly state why the treating opinion has been rejected or discounted.   *See* 20 C.F.R. § 416.927(d)(2); *Drapeau*, 255 F.3d at 1213 (requiring "specific, legitimate reasons" for rejecting opinion of treating physician).  The

Commissioner argues that any error on this point was harmless because Dr. Parry's opinions can be reconciled with the RFC stated by the ALJ and, in any event, the ALJ indirectly considered Dr. Parry's opinions by discussing and adopting the opinion of Dr. Pelc, who had reviewed Dr. Parry's opinions.   The Commissioner contends that by explaining why the ALJ adopted Dr. Pelc's opinions, the ALJ implicitly described why he rejected Dr. Parry's opinions.  However, the Court agrees with Plaintiff.

At the hearing, Dr. Pelc testified regarding Dr. Parry's opinions and the fact that he (Dr. Pelc) disagreed with them.   (*Id.* at 560-62.)   Thus, the Court agrees with the Commissioner that the ALJ had notice of Dr. Parry's opinions.[8]  However, taking notice of the opinion and explaining the weight attributed to it are different concepts and the ALJ's decision does not reference Dr. Parry, at all.[9]  Instead, the ALJ's decision only states that he accorded substantial weight to Dr. Pelc's opinions because of Dr. Pelc's familiarity with the evidentiary standards and Plaintiff's records.  (*Id.* at 34)  In other words, the ALJ may have stated the reasons why he afforded Dr. Pelc's opinion substantial weight, but the ALJ did not properly articulate "specific, legitimate reasons" for his decision to not give Dr. Parry's opinion's controlling weight.  This was reversible error.

The Court cannot say that the ALJ's omission was harmless error because the error

---

[8]   Dr. Parry's notes were also included in the record.

[9]   The ALJ likewise failed to address the opinions of Dr. Jones, Dr. Erik Hammerberg, Dr. Scott Brandt and Dr. Winber.  Not all of these professionals can be considered treating sources and the Court acknowledges that the ALJ need not discuss every piece of evidence in the medical record.  However, Dr. Jones and Dr. Hammerberg's opinions, in particular, lend credence to Dr. Perry's opinions regarding Plaintiff's alleged mental impairments and the ALJ's failure to address them magnifies the failure to discuss Dr. Parry's opinion.

was legal in nature and it affected this Court's ability to review the ALJ's decision.   *See*

*Drapeau*, 255 F.3d at 1213; *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996) (noting

that ALJ's failure to apply correct legal standard may result in remand).   The Commissioner

argues that the Court should be able to determine the reasons that the ALJ declined to

afford controlling weight to Dr. Parry's opinion from the ALJ's statements regarding Dr.

Pelc's opinions in the ALJ's decision.   However, the ALJ's decision does not support the

Commissioner's argument.   The ALJ's decision does not say, for example, that he declined

to give weight to Dr. Parry's opinion for the reasons stated by Dr. Pelc at the hearing.

Instead, the ALJ merely adopted Dr. Pelc's analysis without explaining why Dr. Pelc's

analysis was more accurate (*i.e.*, supported by objective test results) or consistent with the

record than Dr. Parry's analysis.   Thus, as was the case in *Drapeau*, this Court cannot

thoroughly review whether the ALJ's decision is supported by substantial evidence because

the ALJ's decision does not include a discussion of the reasons why the ALJ rejected Dr.

Parry's opinions.   255 F.3d at 1214; *see also Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.

1995) (district court should not be left to speculate what evidence led the ALJ to his

conclusion).

Moreover, Dr. Pelc's consultative review of Plaintiff's inert medical records does not

offer the same indicia of reliability that Dr. Parry's treating relationship does.   *See* 20 C.F.R.

§ 416.927(d)(2) ("Generally, we give more weight to the opinions from your treating

sources, since these sources are likely to be the medical professionals most able to provide

a detailed longitudinal picture of your medical impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from reports of individual examinations, such as consultative examinations or brief hospitalizations."). Thus, the list of permissible reasons that an ALJ may give controlling and/or substantial weight to a consultative medical source differs from the list of permissible reasons that an ALJ may reject a treating medical source opinion.  In other words, using Dr. Pelc's opinion to implicitly discredit Dr. Parry's opinion is like using apples to discredit oranges.

In short, the Commissioner has offered only a *post hoc* rationale to adopt the ALJ's analysis (or lack thereof) of Dr. Parry's opinion, but after-the-fact reasoning is insufficient to allow the Court to review the ALJ's decision on appeal.  Thus, the ALJ may not avoid his obligation to specifically and legitimately explain the why he did not afford Dr. Parry's opinions controlling weight.  The ALJ's error on this issue requires that the case be remanded.

## III.   THE ALJ'S CREDIBILITY DETERMINATION

Plaintiff also argues that the ALJ erred by determining that her testimony was not completely credible.[10]  She argues that the ALJ based his credibility determination solely on the fact that Plaintiff got pregnant, gave birth to, and now cares for her son.  The Commissioner argues that the ALJ correctly determined Plaintiff's credibility and that his decision is supported by substantial evidence.  Upon a review of the record in this case, the Court agrees with the Commissioner on this point.

---

[10]   Although the Court is remanding the case for the reasons discussed above, to complete the record, the Court will briefly address this argument, as well.

Credibility determinations are within the province of the ALJ, as the finder of fact and this Court should not overturn them if they are supported by substantial evidence. *See Winfrey*, 92 F.3d at 1020 (citing *Diaz v. Secretary of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)). Credibility becomes an especially important issue when a claimant has a medically determinable impairment that could reasonably be expected to produce pain, but the claimant's statements regarding the severity of her pain are not well-supported by the record. When this issue arises, an ALJ must follow the three-step test set out by *Luna v. Bowen*, 834 F.2d 161 (10th Cir. 1987), to determine whether a pain-producing-impairment actually results in a finding of "disability." 834 F.2d at 164. The first step of the test is to decide whether the objective medical evidence supports the finding of a pain-producing impairment. *Id.* *Luna* then directs the ALJ to consider whether there is "loose nexus" between the proven impairment and the subjective allegations of pain. *Id.* If the Plaintiff can establish this nexus, the ALJ should determine whether the objective and subjective evidence regarding the pain symptoms provide a sufficient basis to find that a claimant suffers from a disabling impairment. *Id.*

In his written decision, the ALJ applied the *Luna* test and, when he reached the point when he needed to assess Plaintiff's subjective allegations of pain, the ALJ listed and discussed the seven credibility factors from 20 C.F.R. § 404.1529.[11] He further stated in

---

[11]   The seven factors are:

(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your

his written decision that he complied with that regulation, 20 C.F.R. § 416.929 and Social Security Ruling 96-7p, each of which address credibility determinations.  Thus, it appears that the ALJ followed the correct legal standard in assessing Plaintiff's credibility.

Moreover, the ALJ's decision regarding Plaintiff's credibility is supported by substantial evidence in the record.  Notably, the medical evidence and Plaintiff's own submissions contain repeated references to Plaintiff's daily activities, which included basic household chores, full-time care of her infant son, the ability to drive, at least one night of dancing and her periodic workouts using light weights and a StairMaster machine. Plaintiff's daily activities, as borne out by the record, contradict her allegations of a complete and total inability to work due to pain symptoms.  The record also demonstrates that certain activities aggravated Plaintiff's pain symptoms, notably her tendency to "overdo" her workouts.  Additionally, Plaintiff admitted that certain measures, such as shifting positions or lying down briefly helped to alleviate her symptoms.  Further, the ALJ did not say that he found Plaintiff to be completely pain free, and his RFC assessment reflects rather severe limitations on her ability to work.  Thus, the Court concludes that the

---

pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529

ALJ's decision regarding Plaintiff's credibility is supported by substantial evidence in the record.

## IV.    THE ALJ'S HYPOTHETICAL QUESTION

Plaintiff's final contention of error is that the ALJ submitted an improper hypothetical question to Ms. Pauline, the vocational expert, at the hearing.   Plaintiff argues that the ALJ's hypothetical was inconsistent with treating opinions and impermissibly vague.  Thus, Plaintiff contends that the Commissioner has not met his burden at step five of the sequential analysis.

However, because the Court has determined that the ALJ erred in failing to address his treatment of Dr. Parry's opinion, the RFC and resulting hypothetical questions posed to the vocational expert on remand might change with the input of Dr. Parry's opinion. Thus, except to say that it disagrees with Plaintiff that the hypothetical posed to Ms. Pauline at the previous hearing was impermissibly vague, the Court declines to address Plaintiff's final argument at this time.

## CONCLUSION

The Court concludes that the ALJ committed reversible error when he failed to explain what weight he gave the opinion of Dr. Parry or why he rejected it.  On remand, the ALJ should address Dr. Parry's opinions and any other medical opinions that may be material to a determination of Plaintiff's RFC.   The ALJ should then structure any hypothetical questions accordingly.

Accordingly, this matter is REVERSED AND REMANDED for additional proceedings consistent with this opinion.

DATED:  June   2nd   , 2009

BY THE COURT:

_____
CHRISTINE M. ARGUELLO
United States District Judge

29